**Opinion issued September 29, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00865-CV

———————————

### ALEXANDRE NOVAIS, Appellant

### V.

### DAVID L. TEEL AND GIANG NGUYEN, Appellees

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-16863**

---

## MEMORANDUM OPINION

Appellant Alexandre Novais brought a negligence suit against appellee David

L. Teel for personal injury damages arising from an auto collision.[1] Novais appeals

---

[1]    Novais also sued Giang Nguyen, the owner of the pickup truck Teel was driving at the time of the collision. However, Novais nonsuited his claims against Nguyen before trial, and thus Nguyen is not a party to this appeal.

the take-nothing judgment against him, which the trial court entered after a jury trial. In two related issues, Novais contends that the trial court abused its discretion by admitting into evidence portions of a statement given by Novais to an agent of Teel's insurance company.

We affirm.

## Background

### *The Collison*

On November 11, 2015, Novais, who was driving an 18-wheeler, and Teel, who was driving a pickup truck, collided on Highway 59 in Houston. At trial, the parties disputed whether an unsafe lane change by Teel or Novais caused the accident. Novais testified that he was driving in the center lane (lane three) of traffic on a five-lane highway and that the two lanes of traffic to the right of the center lane (lanes four and five) both exited the highway. Novais testified that the traffic in the right two lanes was highly congested and that Teel was stuck in traffic in the second rightmost lane (lane four). Novais testified that Teel changed lanes from the second rightmost lane (lane four) into the center lane (lane three), striking Novais's vehicle.

In contrast, Teel testified that he successfully changed lanes from the second rightmost lane (lane four) into the center lane (lane three), without incident. Teel further testified that about five to ten seconds after changing lanes into the center lane, he saw the cars in front of him beginning to slow and so he began to "back off

2

the accelerator . . . and start to slow down." That is when Teel felt the impact to the left rear of his vehicle. The accident caused significant damage to both vehicles, and neither was drivable from the scene of the accident. According to Teel, Novais exited his vehicle immediately after the accident and ran back toward Teel's vehicle. Novais was not limping and did not appear to be injured.

Dillon Crowson, an eyewitness to the accident, also testified at trial. Crowson testified that the pickup truck driven by Teel was a few cars in front of Crowson's vehicle in the same lane and that the 18-wheeler driven by Novais was traveling faster in the center lane. Crowson testified that, though he did not recall all the details of the impact itself, he believed the collision happened shortly after the pickup truck driven by Teel attempted to change lanes into the center lane. In his view, the accident resulted from the unsafe lane change by Teel. However, Crowson admitted he did not actually see the impact. To Crowson, Novais appeared to be shaken up after the accident but uninjured.

Officer J. Ramos with the Houston Police Department responded to the scene of the accident. In his report, he noted that the pickup truck, driven by Teel, was traveling in lane four and tried to switch lanes into lane three, while the 18-wheeler, driven by Novais, was traveling in lane three. Officer Ramos also noted in his report that neither Novais nor Teel was injured in the accident.

*Novais's Injuries and Treatment*

Novais testified he began to have pain in his knee, neck, and shoulder after the accident. He testified that his knee began to swell immediately after the accident, and that he felt the pain in his shoulder and neck the next day. However, he did not go to a doctor until about five or six weeks after the accident because he did not have any money to pay for the doctors. On December 21, 2015, Novais saw Dr. Alj Sparrow at Complete Pain Solutions, who noted that Novais was experiencing neck pain, specifically radiculopathy, and right knee pain.[2] Dr. Sparrow referred Novais to Memorial MRI & Diagnostic, where, in January 2016, Novais underwent multiple MRIs showing a meniscal tear in Novais's right knee and cervical disc herniation at C5-C6.

As reflected in his medical records, Novais was then seen by Dr. A. Dushi Parameswaran at Allied Orthopedics. Dr. Parameswaran conducted an initial examination of Novais on January 28, 2016, and concluded that Novais was suffering from a cervical sprain/strain and a right knee medial meniscus tear. Dr. Parameswaran recommended physical therapy for the cervical spine and surgery followed by physical therapy for the right knee.

---

[2] Dr. Sparrow did not testify at trial, nor were the medical records from Novais's December 21, 2015 visit with Dr. Sparrow introduced at trial. However, Dr. Mohammed Etminan, a defense expert, reviewed the records and testified to their contents.

4

Novais also saw Dr. James D. Key, who performed a series of steroid injections in Novais's neck. Dr. Key referred Novais to Gerald Williams, a physical therapist at Kirby Multi-Specialty.[3] Williams's initial physical therapy evaluation, performed on April 7, 2016, noted that Novais presented with "complaints of severe neck pain with no radiating pain into the upper extremities" as well as right knee pain. Williams concluded that Novais had "signs and symptoms consistent with cervical radiculopathy and right knee medial meniscal tear" and that the potential for improvement with physical therapy was good. When physical therapy did not improve his knee, Novais underwent surgery for the meniscal tear in June 2016.

Novais next saw a neurosurgeon, Dr. Juan Martin, on February 7, 2017. Dr. Martin noted that Novais continued to have "significant neck pain with bilateral shoulder pain and worse right shoulder radiation with arm numbness and tingling" and that Novais stated he experienced radiating pain down his arm when he turned his head. Dr. Martin testified that Novais had received injections in his cervical spine, as well as physical therapy, but neither worked for Novais. Therefore, after looking at his medical records and conducting a physical examination, Dr. Martin diagnosed Novais with a radiculopathy at the level of C6 and disc herniation between C5 and C6 and recommended that Novais have surgery for the herniated disc. Novais

---

[3]    Neither Dr. Key nor Williams testified at trial.

underwent neck surgery (an interior, cervical discectomy at level C5-C6), performed by Dr. Martin, on March 7, 2017.

Dr. Martin testified that he believed that this injury was the result of the November 11, 2015 collision and that there was nothing else in Novais's medical history that could have caused this injury. Although Dr. Martin admitted he was not a knee surgeon, he opined that the torn medial meniscus also was related to the November 11, 2015 collision.

Teel presented the testimony of Dr. Mohammad Etminan, a board-certified orthopedic surgeon who reviewed Novais's medical records and examined Novais in 2017. Dr. Etminan did not agree that Novais was injured in the November 2015 accident. For instance, Dr. Etminan testified that he reviewed the medical records from Novais's initial visit with Dr. Sparrow and, although Dr. Sparrow diagnosed Novais with radiculopathy, Dr. Sparrow did not document any actual symptoms of radiculopathy (such as numbness, tingling, weakness in arms or hands). Dr. Etminan thus opined that Novais did not have radiculopathy when he saw Dr. Sparrow in December 2015, which indicated to Dr. Etminan that there was no evidence of symptomatic neural compression of Novais's spine. Dr. Etminan also testified that the examination of Novais's lumbar spine during the December 21, 2015 visit was completely normal with full range of motion and no tenderness.

Dr. Etminan also testified that he reviewed the January 5, 2016 MRI of Novais's cervical spine which showed some disc bulging in the spine. In his opinion, however, none of the bulging was medically significant or of clinical relevance because the MRI showed only that certain bulges touched the spinal cord, not that there was any spinal cord compression. Dr. Etminan testified that, from his review of the MRI, he saw evidence of only mild degenerative disc disease and some disc bulging, but "nothing that would make me think: let me sharpen my scalpel." Dr. Etminan observed some minor swelling in Novais's right knee on the MRI, but the swelling was not as significant as would be expected to occur after an acute injury. Therefore, Dr. Etminan opined that Novais's injury appeared to be a result of a chronic, as opposed to acute, condition.

Dr. Etminan testified that he reviewed medical records from Novais's January 28, 2016 visit to Dr. Parameswaran and that the examination of Novais's cervical spine revealed no problems with sensation, motor strength or reflexes; all were normal, which indicated to him that Novais was experiencing some neck pain. But there was no evidence of any pinched nerves causing radicular type symptomology. Dr. Etminan testified further he does injections as part of his medical practice and that, based on his review of Novais's medical records and films and the medical literature regarding epidural steroid injections, the cervical epidural steroid injections done by Dr. Key were not medically reasonable or necessary.

Dr. Etminan also reviewed the medical records associated with Novais's visits with Dr. Martin. Dr. Etminan testified that during the February 7, 2017 visit, Novais complained of pain radiating into his right arm with numbness and tingling. According to Dr. Etminan, this was the first time the symptoms of radiating pain, numbness, or tingling were noted in Novais's medical records. Dr. Etminan testified that, had he been treating Novais, he would not have proceeded with the surgery because, based on the MRIs, there was no clear explanation as to why Novais was experiencing symptoms of stiffness and arm pain. Instead, Dr. Etminan would have tried to determine the cause of Novais's pain by conducting a more thorough workup, additional MRI, and additional physical therapy.

Finally, Dr. Etminan testified that he examined Novais on November 7, 2017. Although his examination of Novais revealed significant stiffness and rigidity in Novais's entire back, including the neck, Dr. Etminan explained that such significant rigidity is typically not associated with either traumatic or atraumatic degenerative changes but rather indicates a condition such as inflammatory arthritis. Nothing in Dr. Etminan's examination of Novais established a connection between the stiffness that Dr. Etminan observed to the November 2015 accident. Dr. Etminan further opined that, although Novais's medical records reflected various injuries, he did not believe these injuries resulted from the November 2015 collision because: (1) Novais reported no injury at the scene of the accident; (2) there was a meniscus

tear in Novais's knee that appeared to be degenerative—not acute—due to the lack of swelling in the knee; (3) the likelihood that this one event—the collision—caused four bulging discs in his neck was statistically zero; (4) there was nothing objective on the MRI of Novais's neck to indicate this was an acute event; and (5) there were long periods of time when Novais received no treatment at all for these injuries.

### *Novais's Damages*

Novais sought damages for past and future loss of earning capacity, past medical expenses, future medical expenses, and other noneconomic damages. To establish his future medical expenses, Novais presented the testimony of Dr. Sasha Iverson, Novais's life care planner, who estimated Novais's future medical care expenses to be $714,866. Dr. Iverson based her life care plan on Novais's conditions related to his neck, back, and right knee. Included in her estimated costs were expenses for prescription medications, equipment and supplies, lumbar braces, and additional surgeries related to these conditions.

### *The Recorded Statement*

Before trial, Novais filed a motion in limine to exclude a recorded statement given by Novais to Teel's insurance company under Texas Rule of Evidence 408 because the statement was made during settlement negotiations.[4] According to

---

[4] Texas Rule of Evidence 408 provides that, with exceptions for certain permissible uses, evidence of the following is not admissible: "(1) furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable

Novais, the purpose of the telephone call, which occurred about five weeks after the accident (on December 18, 2015), was to discuss Novais's property-damage claim. During this telephone call, which was recorded, Novais stated multiple times that he was not injured in the accident. The trial court granted the motion in limine, ruling that the statement would not be preadmitted but that its admissibility would be revisited at trial.

During trial, Colonel Smith testified as an expert for Novais on two subjects: accident reconstruction and biomechanics. Colonel Smith testified that biomechanics is a branch of physics that deals with the application of forces to something that is alive. He explained that he did not diagnose injuries—that is "purely [the] purview of the medical profession"—but that biomechanics will tell you "whether forces applied where medical providers found injuries and are these the types of injuries to occur." Thereafter, Novais's counsel played a demonstrative video. This video showed the motion of Novais's body during the accident from three different angles and included a notation at the top of each frame depicting the time at which the "point of herniation" occurred. After showing the jury the video, Colonel Smith testified on direct as follows:

---

consideration in compromising or attempting to comprise the claim; and (2) conduct or statements made during compromise negotiations about the claim." TEX. R. EVID. 408.

Q. Okay. Is this—is this type of motion the kind of motion that you would be—would be consistent with the type of injuries that he's suffered in this situation?

A. Yes. This is the type of motion that causes these types of injuries. Again, whether or not he has the injury is a medical decision.

Q. And we'll have later medical testimony about that. But this—this type of motion is the type that would cause this type of injury; is that correct?

A. Yes, sir.

Teel's counsel cross-examined Colonel Smith about his opinions. Twice during cross-examination, Colonel Smith mentioned the recorded statement in response to Teel's counsel's questioning about whether Colonel Smith discovered or noted inconsistencies in Novais's statements in his report, but Colonel Smith did not mention the discrepancy related to whether Novais was injured.[5]

At the conclusion of the cross-examination, Teel argued that portions of the recorded statement should be admitted because Colonel Smith had referenced the recorded statement as something he reviewed and relied on and testified about discrepancies he found between Novais's statement and his interview. Teel further argued that the recorded statement was admissible because the video played for the jury and purporting to show Novais's injuries was inconsistent with Novais's declarations in the recorded statement that he was not injured.

---

[5]     The two discrepancies Colonel Smith noted between Novais's recorded statement and Novais's interview with Colonel Smith related to the distance Novais's vehicle moved post-accident and the location of the damage to Novais's vehicle.

After significant argument from both sides, the trial court ruled that the portions of the recorded statement where Novais stated that he was not injured would be admitted because "it is fair cross-examination of this witness that he reviewed a statement that you provided to him from the plaintiff where the plaintiff said things that are inconsistent with his opinions, concerning the point of herniation."

Novais argued that if the trial court admitted these portions of the recorded statement, then the entire statement should be admitted to provide context under the rule of optional completeness. The trial court denied Novais's request to admit the entire statement but did allow certain additional portions of the statement to be played to the jury as follows:

Q. Auto Claims Department, this is Amanda; how can I help you?

A. Hi Amanda. Good morning. My name is Alexandre Novais. Uh, a month ago, uh, someone hit me. And my insurance gave me this phone number to call you. Because they hit my car. And, uh, I tried to see what they're gonna do to collect my down time. I know the (inaudible). The lady just told me to call you and ask for you. I want like more pay, more payment to go right to you guys, 'cause because we see this because it's already a month to go, you know.

Q. Okay.

A. I'm home for 30 days already, not working because of this.

Q. I see. Okay. Do you have claim number? And I can take a look at.

A. Yeah, ma'am, I do. Uh, the claim – the claim number is 3004927089.

Q. Okay. Let me get that pulled up. Give me just a moment.

A. Uh-huh.

Q. Uh, so were you injured in the accident?

A. Yes.

Q. You were injured. Can you tell me about your injury?

A. No, no, no. I'm – I'm – I wasn't injured. I'm sorry. I didn't – both us don't have any injuries (inaudible) that day.

Q. So you're – you're not injured but you haven't been able to work is what you're saying.

A. Yeah.

Q. Okay.

A. Because I – this is an extend – my – this is my work.

Q. Okay.

A. That truck was (inaudible).

Q. I see. I see. Okay. Um, well yeah, I'm a liability adjustor so I investigate accidents.

A. Yes.

Q. And, um, I'd like to talk with you about how the accident happened.

A. Uh-huh.

Q. Um, what I would like to do is take a formal statement from you about the accident.

A. Okay.

Q. So, uh, I will do a small introduction and then ask you some questions about what happened. Okay?

A. Uh-huh.

Q. Okay. This is Amanda Moore having a recorded conversation, number 3004927089. Today is December 18th, 2015. It's 11:32 a.m.

13

Central Time. And just for the statement, would you please say your name?

A. Alexander Xavier Novais.

Q. Do you understand this is being record[ed]?

A. Yes, ma'am.

Q. And will you verify your date of birth, please?

A. [Response].

Q. And I show the accident happened on November 11th, and that was a Wednesday; is that correct?

A. Yes.

Q. Were you driving in this accident?

A. Yes, I was driving. Uh-huh.

Q. And just to confirm, you said that you were not injured in the accident in any way?

A. No. No, I'm not.

Q. Nothing requiring medical attention, nothing like that?

A. No.

Q. Okay?

A. No, ma'am. No.

Q. Did you have any – did you have any passengers with you?

A. No. No. It was just me.

Q. Okay. I was told the accident happened on Beltway 8 East in Houston; is that right?

A. Yes.

Q. Can you tell me what happened in the accident, please?

14

A. Yes. I was driving in the third lane and, you know, going east on the Beltway. And, uh – uh, I this – this highway have five swings [sounds like] uh, this – this guy was in the fourth lane, and he just jumped in front of me. I can't avoid him because was to[o] close and had another (inaudible) right next to me. So I hit him riding in the, uh, left-hand side. He hit me in the left-hand side and my truck hit his front. I lost a tire and, you know, my truck leaned on the right-hand side resting on the corner of the highway. And he's (inaudible) highway [static] right-hand side, too. So that's – that's how it happened.

Q. Okay. So when you're saying that, um, he was in the – so the third, so you're talking about from the left. Like when you said the third lane, you mean from the left, third lane from the left?

A. No. The – the – the – this highway has five lanes, right?

Q. Uh-huh?

A. So from the – from left to the right, I was driving on the third lane, and he was in the fourth lane.

Q. Right. So the – the far left lane is lane number one, then two. Then you were in the lane number three, which would be the middle lane –

A. Yes.

Q. – of the five?

A. Yes, ma'am.

Q. So, then, he was to your right side in the fourth lane. And you're saying that he moved from the fourth lane to the third lane into path?

A. Yes. Exactly. Yeah. He's trying to avoid – I don't know if he's trying to avoid the he traffic. I don't know what – what he struck. Then he just jumped in front of me. So I didn't have time to react because of (inaudible) like two feet in front of me say (inaudible). Next to me I have another (inaudible) so it's okay, then.

Q. I see. Okay. And how was the weather? Was it raining or anything?

A. No, the weather was – was perfectly sunny, dry, daylight.

15

Q. Okay. And I show that you were driving a 2006 Freightliner?

A. Yes, ma'am.

Q. And you mentioned the damage was on your driver's side. Could you tell me where on the driver's side it is?

A. Yes. Uh, the hood, the fender. There's a little quarter fender next to the hood, the tire, the van, uh, the bar holds the tires together. I don't know how the name. There's a bar there.

Q. Okay.

A. There's a water tank, the tank was down, the steps to go to the tank was gone. He hit the – the sidewall (inaudible)

Q. Hmm.

A. That was pretty – pretty – pretty big. He had (inaudible) the hood and lots – lots of things they have to replace because of the accident of the accident.

Q. Okay.

A. Especially the (inaudible) fixing.

Q. Oh, it's being fixed right now? Okay.

A. Uh-huh.

Q. Okay. Is there any old or unrepaired damage on your vehicle?

A. No.

Q. Was your vehicle drivable from the accident or did it have to get towed?

A. No. It had to get towed because it knocked the my – my – um, my tire off.

Q. Oh.

A. Another thing that this bar holds the – the – the – holds the – the tires the same bent. My – my truck no turn. Yeah, in um, uh-huh. The tire's gone so it was undrivable.

After the close of evidence, the jury returned a verdict finding both Novais and Teel negligent in the accident and assigning 50% liability to Novais and 50% liability to Teel. The jury awarded Novais zero dollars in damages. The trial court entered a take-nothing judgment in accordance with the jury's verdict, and this appeal followed.

## Standard of Review

The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Benson v. Chalk*, 536 S.W.3d 886, 894 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Benson*, 536 S.W.3d at 894. We will uphold a trial court's evidentiary ruling if any legitimate ground supports the ruling. *Benson*, 536 S.W.3d at 894.

## Admissibility of Evidence

In two related issues, Novais contends that the trial court abused its discretion by admitting portions of Novais's recorded statement. First, he argues that the recorded statement was inadmissible under Texas Rule of Evidence 408 because it

17

was made during settlement negotiations. In connection with this issue, he also argues that the trial court abused its discretion by admitting the recorded statement under the theory that Novais's expert witness, Colonel Smith, opened the door to the recorded statement. Second, Novais argues that even if the door was opened to the recorded statement, Colonel Smith's testimony did not touch on the portions of the recorded statement related to Novais's injuries and, therefore, the trial court abused its discretion by admitting those portions of the statement.

We do not decide whether the trial court erred in admitting the recorded statement because reversal is only appropriate when error in the admission of evidence was harmful. *See* TEX. R. APP. P. 44.1; *see also Bay Area Healthcare Grp.*, 239 S.W.3d at 234. That is, to obtain reversal based on the erroneous admission of evidence, the appellant must show three elements: (1) the trial court erroneously admitted evidence, (2) no other similar evidence was admitted, and (3) the error probably caused the rendition of an improper judgment. *In re C.E.M.*, 64 S.W.3d 425, 429 (Tex. App.—Houston [1st Dist.] 2000, no pet.); *see also Alvarado v. Farah Mfg. Co., Inc.*, 830 S.W.2d 911, 917 (Tex. 1992).

Error based on the admission of evidence is generally not reversible unless the appellant can demonstrate that the judgment turns on the particular evidence admitted. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). "We examine

the entire record to determine whether the judgment is controlled by the evidence that should have been excluded." *Fairmont Supply Co. v. Hooks Indus., Inc.*, 177 S.W.3d 529, 532 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

As Teel points out, in addition to the recorded statement, other unobjected-to testimony was admitted that supports the jury's award of no damages to Novais. As described above, Teel presented ample evidence that Novais was not injured in the accident and that his injuries instead may have been the result of chronic conditions. For example, both Teel and Crowson testified that they saw Novais walking or running immediately after the accident and that he did not appear to be injured. In addition, Officer Ramos noted in his police report that Novais was not injured in the accident. And Novais testified that although he began experiencing pain in his neck and knee immediately after the accident, he did not see a doctor for more than five weeks and, then, only at the recommendation of his attorney.

With respect to Novais's neck and knee injuries, Novais's expert, Dr. Martin, testified that it was his opinion these injuries resulted from the collision. However, Teel presented contrary testimony from Dr. Etminan, who did not dispute that Novais had injuries, but opined that the injuries did not result from the accident because: (1) Novais reported no injury at the scene of the accident; (2) the meniscus tear in Novais's knee appeared to be degenerative—not acute—due to the lack of swelling in the knee; (3) the likelihood that this one event—the collision—caused

four bulging discs in his neck was statistically zero; (4) there was nothing objective on the MRI of Novais's neck to indicate this was an acute event; and (5) there were long periods of time when Novais received no treatment for these injuries. As the sole judge of credibility of witnesses and the weight to be given to their testimony, the jury was free to believe Teel's version of events over Novais's version and could have given more weight to the evidence that tended to show that Novais's injuries did not result from the accident at issue. *See Walker v. Scopel*, No. 14-14-00411-CV, 2016 WL 552197, at *6 (Tex. App.—Houston [14th Dist.] Feb. 11, 2016, no pet.) (mem. op.) (concluding that defendant presented ample evidence that plaintiff's injuries may have been the result of prior accident or normal aging, and that the jury was free to believe defendant over plaintiff); *see also Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) ("[T]he jury is the sole judge of the credibility of witnesses and the weight to be given to their testimony.").

On this record, Novais has not shown that the case turned on the admission of the recorded statement, and we conclude that the admission of Novais's statements in the recording that he was not injured probably did not result in an improper judgment. *See Interstate Northborough P'ship*, 66 S.W.3d at 220; *Alvarado*, 897 S.W.2d at 753–54; *see also Walker*, 2016 WL 552197, at *6 (holding that any error in admission of post-accident photographs showing limited damage to plaintiff's vehicle was harmless in light of ample other evidence presented that plaintiff's

20

injuries might have resulted from prior accident or normal aging). Accordingly, we hold that any error in the admission of the recorded statement was harmless.

We overrule Novais's first and second issues.

## Conclusion

We affirm the judgment of the trial court.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Landau and Countiss.